"K" CARE, INC., a Wisconsin corporation; Thomas Koenig and Patricia Koenig, Plaintiffs-Respondents,

v.

TOWN OF LAC DU FLAMBEAU, Defendant-Appellant.

Court of Appeals

*No. 93–2032–FT. Submitted on briefs October 15, 1993.—Decided December 7, 1993.*

(Also reported in 510 N.W.2d 697.)

On behalf of appellants, the cause was submitted on the briefs of *John L. O'Brien* of *Drager, O'Brien, Anderson, Burgy & Garbowicz* of Eagle River.

On behalf of respondent, the cause was submitted on the brief of *John C. Houlihan* of *Johnson, Weis, Paulson & Priebe, S.C.* of Minocqua.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J. The town of Lac du Flambeau appeals an order reversing its refusal to grant "K" Care, Inc., permission to build an eight-bed community based residence for elderly handicapped on a forty-acre site in the town.[1] The circuit court concluded that the town failed to make "reasonable accommodations" required by the Fair Housing Act, 42 U.S.C.A. § 3604(f)(3)(B) (1977), and therefore the refusal constituted housing discrimination against the handicapped under the Act. We agree and affirm.

---

[1] This is an expedited appeal under Rule 809.17, Stats.

The underlying facts are not in dispute. "K" Care runs a fifteen-person community based residential facility for the elderly on its property in a quiet rural residential neighborhood of Lac du Flambeau. The town approved the necessary zoning change for the existing facility, and the neighbors generally were receptive to it. "K" Care decided to build a second residential home for eight additional elderly on its forty-acre parcel. There were references to fifteen additional residents in the hearing record. This number, however, appears to refer to possible future expansion not contemplated by the proposed plan. It applied to the town board for an exception to sec. 62.23(7)(i)1, Stats., which prohibits the establishment of two such facilities within 2,500 feet of each other unless an exception is granted in the discretion of the town. [2] The town board held a hearing to decide the issue and voted to deny an exception to the distance requirement. "K" Care filed a complaint in the circuit court, alleging that the board's refusal was a failure to make reasonable accommodations within the meaning of the FHA, and therefore was discriminatory. The complaint also alleged that the board abused its discretion and acted arbitrarily by denying its request for an exception contrary to the

---

[2] Although the parties and the circuit court applied sec. 62.23(7)(i)1, applicable to cities, sec. 60.63(1), Stats., applies to townships. The language of each is comparable, and sec. 60.63 (1) states:

> No community living arrangement may be established after March 28, 1978 within 2,500 feet, or any lesser distance established by an ordinance of the town, of any other such facility. Agents of a facility may apply for an exception to this requirement, and such exceptions may be granted at the discretion of the local town. Two community living arrangements may be adjacent if the town authorizes that arrangement and if both facilities comprise essential components of a single program.

popular vote in favor of the exception by the town electorate.

The tapes of the town board meeting submitted to the court were inaudible, and the court remanded the matter to the board for a new proceeding. The town board held a new hearing on the matter and, after taking testimony for and against "K" Care's application, it again denied the request for an exception to the distance requirement. In its written decision, the board reviewed the legislative purpose behind the distance requirement and concluded:

> That if all other property owners and spouses who own within a 2,500 foot radius were to occupy their residences simultaneously, they would number approximately 50 people. That the residents and staff of the entire proposed "K" Care facility would number 25, thus creating a situation where one-third of the total potential population density of a quarter-mile area would be located at one site, thereby totally destroying the established residential character of the neighborhood. That inasmuch as residents of "K" Care primarily use the buildings and immediate grounds and not the surrounding neighborhood or public roads, granting the application would result in an atmosphere of a commercial rehabilitative facility and not that of a residential neighborhood, thus defeating legislative purpose. That granting the application would create exactly the type of density which the legislature sought to avoid.

Parties aggrieved by an agency denial of a zoning variance may seek certiorari relief.[3] A court may

---

[3] "K" Care's complaint alleged as a separate cause of action a claim that the town violated the provisions of the FHA. The

reverse or affirm, wholly or partly, or may modify the agency decision brought for review. *See* sec. 62.23(7)(e)10, Stats. A review of a zoning agency decision is limited to: "(1) whether the board acted within its jurisdiction and authority; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive or unreasonable; and (4) whether the evidence was such that the board might reasonably make the determination it did." *Ledger v. Waupaca Bd. of Appeals*, 146 Wis. 2d 256, 261, 430 N.W.2d 370, 371-72 (Ct. App. 1988).

■

Whether facts fulfill a particular legal standard is a question of law this court reviews de novo. *Nottelson v. DILHR*, 94 Wis. 2d 106, 115-16, 287 N.W.2d 763, 768 (1980). We conclude that the evidence presented to the town board in this case was such that it could not reasonably make the determination it did.

■

Our conclusion is premised upon a determination that the FHA, by its own terms and by virtue of the supremacy clause of the United States Constitution, controls the provisions of secs. 62.23(7)(i)1, and 60.63(1), Stats., to the extent the state law may be used to discriminate. 42 U.S.C.A. § 3615 (1977) notes: "[A]ny law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid."

*United States v. Marshall*, 787 F.Supp. 872, 878 (W.D. Wis. 1991), is in accord. *Marshall* reversed the denial of a similar community residential facility, and

parties, however, did not conduct an independent trial on this claim and treated the matter before the court as one of certiorari review. We therefore review the matter in the same fashion.

held that the "reasonable accommodations" to the handicapped provisions of the FHA prevails over an unwarranted application of the 2,500-foot spacing requirements of sec. 62.23(7)(i)1, Stats.

42 U.S.C.A. § 3604(f)(3)(B) (West Supp. 1993) states in part:

> [I]t shall be unlawful—
> . . . .
> (f)(1) To discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of—
> . . . .
> (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or
> . . . .
> (3) For purposes of this subsection, discrimination includes—
> . . . .
> (B) a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling. . . .

The town argues that the FHA does not apply to "K" Care because the residents of the proposed facility are not handicapped within the meaning of 42 U.S.C.A. § 3602(h) (1977). We disagree. Section 3602(h) defines handicap as:

> (1) a physical or mental impairment which substantially limits one or more of such person's major life activities,
> (2) a record of having such an impairment, or

(3) being regarded as having such an impairment. . . .

Whether the residents of the proposed facility are handicapped within the meaning of the FHA is thus a question of statutory interpretation, a question of law we review de novo. *See Humphrey v. Elk Creek Lake Protection*, 172 Wis. 2d 397, 400, 493 N.W.2d 241, 243 (Ct. App. 1992).

At the hearing before the town board, uncontradicted evidence was presented that the present group home residents were frail elderly. Most suffer from disabilities that often affect the elderly. Some residents had suffered strokes, others have had hip replacements, others suffered early dementia. Heart problems, high blood pressure and diabetes were also common ailments. None of the residents require skilled nursing, though all require assistance in daily living. Some require assistance eating, bathing and using a toilet. Some residents need assistance using a walker or exiting in the event of an emergency. Others are confined to a wheelchair.

██

We conclude that the proposed residents of the new facility, whose physical condition is undisputed, are handicapped within the meaning of the FHA. These residents obviously suffer from physical and mental impairments that substantially limit one or more major life activities. They are unable to eat, bathe, walk or use a toilet without assistance. In short, they are no longer able to live independently. These are substantial limitations. Our interpretation is consistent with that applied in similar cases by federal courts. For example, in *United States v. Taylor*, 798 F.Supp. 442, 446 (E.D. Mich. 1992), the court concluded that elderly residents at an identical type

facility who suffered from senile dementia, hypertension and hip replacements were handicapped under the Act. *See also Potomac Group Home Corp. v. Montgomery County*, 823 F.Supp. 1285 (D. Md. 1993).

We turn next to the question of whether the town discriminated against "K" Care in violation of the Act. We conclude, as did the circuit court, that the board failed to make "reasonable accommodations" as required by the Act. In general, a reasonable accommodation is one that would not impose an undue hardship or burden upon the entity making the accommodation, and would not undermine the basic purpose the requirement seeks to achieve. *Marshall*, 787 F.Supp. at 878.[4]

The evidence presented at the hearing does not support the town board's determination that granting an exception would undermine the purpose of sec. 62.23(7)(i)1, Stats. Because we apply the certiorari standard of review, we are hesitant to interfere with the board and accord its decision a presumption of correctness and validity. *Hudson v. Hudson Town Bd. of Adjust.*, 158 Wis. 2d 263, 276, 461 N.W.2d 827, 831 (Ct. App. 1990). Nevertheless, its finding that an exception would undermine the purpose of the spacing statute must be supported by sufficient evidence in order to render that finding reasonable. *See id.* at 277, 461 N.W.2d at 832.

The legislative purpose in enacting the spacing requirements is embodied in sec. 1, ch. 205, Laws of

---

[4] *Marshall* cites *Majors v. Housing Auth.*, 652 F.2d 454, 457 (5th Cir. 1981), and *Doherty v. Southern College of Optometry*, 862 F.2d 570, 575 (6th Cir. 1988), for these definitions.

1977. Section 1 reflects the intent that the spacing requirements restrict the density of community living arrangements in residential neighborhoods. The legislative goal was to preserve the established character of a neighborhood so that residents of the facility could live in a normal residential setting in a manner similar to other residents of the area rather than in an institutionalized setting. It was believed this would maximize the rehabilitative potential of the facility and speed the residents' return to their own homes by providing the required supervision without the expense and structured environment of an institution.[5]

Our independent review of the evidence leads us to the same conclusion reached by the circuit court:

> [T]here was no evidence before the Lac du Flambeau Town Board to support a finding that the

[5] Section 1, ch. 205, Laws of 1977, states in part:

It is the legislature's intent to promote public health, safety and welfare by enabling persons who otherwise would be institutionalized to live in normal residential settings, thus hastening their return to their own home by providing them with the supervision they need without the expense and structured environment of institutional living. To maximize its rehabilitative potential, a community living arrangement should be located in a residential area which does not include numerous other such facilities. The residents of the facilities should be able to live in a manner similar to the other residents of the area. The legislature finds that zoning ordinances should not be used to bar all community living arrangements since these arrangements resemble families in all senses of the word except for the fact that the residents might not be related. . . . The legislature believes these matters of statewide concern can be achieved only by establishing criteria which restrict the density of community living arrangements while limiting the types of and number of facilities which can exist in residential neighborhoods having an appropriate atmosphere for the residents, thereby preserving the established character of a neighborhood and community.

second group home would have any significant adverse impact on the legitimate goals of the Wisconsin Statute or would impose any expense or burden upon the town, [and] failure to grant the exception constitutes a failure to make reasonable accommodation as required by [the Fair Housing Act] and consequently is an act of discrimination as defined in the [Act].

Because we conclude that the evidence renders the board's decision unreasonable, we summarize that evidence. The existing home houses fifteen residents near the southeast corner of a forty-acre parcel owned by "K" Care, bordered on the east by a 1,000-foot shoreline along a cloverleaf-shaped lake. To qualify for occupancy, a resident cannot be bedridden. They do not use the lake. They do not drive autos. Except for occasional trips to the mailbox, to walk in the company of staff to the end of the macadam road that passes through the property to the west, or to tend to flowers on the premises, the residents primarily stay indoors and participate in various forms of recreation or programming.

The owners gave two reasons for seeking to build on the forty-acre site that happens to place them within a 2,500-foot radius. One was for administrative efficiency. "The other reason is that this is beautiful, flat land. I looked for a home and property . . . for over two years. You want your residents who are capable of getting out to be able to walk. This is very hilly area up here. I looked at places in Eagle River, Three Lakes, Minocqua. The land wasn't suitable."

"K" Care also presented the testimony of a planning consultant specializing in Fair Housing Act cases. Based upon nationwide studies, he opined that the proposed residence would have no adverse effect on

property values. He noted that the crime rate for people in these homes is dramatically lower than in the general population. Community based residential facilities are designed to look like any other houses, albeit somewhat larger. He observed that under the town's current zoning code, the same forty acres could be developed to support approximately twenty-seven homes, including ten lake front lots with a minimum lot size of 20,000 square feet. He conducted a traffic count and found it to be many times less than "any conceivable traffic standard" would suggest is reasonable.

He observed that the neighbors' homes were separated by forest and lake, and contrasted the adverse impact on the character and serenity of the neighborhood between the presence of the proposed eight elderly residents and that of families, including teenagers, using autos, boats, snowmobiles and the like. He concluded that the proposed facility would retain a residential rather than a commercial character.

The opponents to the home merely expressed concern for "privacy." It is readily apparent from their testimony that concern about a change in the character of the neighborhood was not grounded upon the fear of an institutional development, but upon the loss of seclusion that would occur with any increase in population. This reading of the evidence is demonstrated in the testimony of one such neighbor: "I have never, ever seen any residents standing on their lake shore. So, presumably they do as the applicants have stated—that they sit outside in the patio or take a short walk. . . . It doesn't matter that they are elderly. It wouldn't matter whether they were 42 years old. . . . It's

just that I perceive the lake and the lake front area as less private when there are more people."[6]

The only evidence presented in opposition and the only factual basis for the town's refusal to grant an exception reflects opposition to *any* change in density and not a rational basis from which to conclude that the proposed facility for eight more people would alter the residential character of the neighborhood.

Because the evidence before the town board did not support its decision that the purpose of the spacing statute would be undermined by granting an exception, we conclude that the town did not make a reasonable accommodation to "K" Care under the FHA. The neighbors' opposition to additional residents in the area did not constitute evidence that a second residential facility would create an institutional atmosphere. The Wisconsin legislature made a finding that "zoning ordinances should not be used to bar all community living arrangements since these arrangements resemble families in all senses of the word except for the fact that the residents might not be related." *See* note 5. Thus, reliance upon the state spacing statute, in view of the evidence presented, to bar the proposed residence constitutes discrimination against the handicapped under the federal law. We therefore affirm the trial court's order granting "K" Care an exception to the spacing limits.

*By the Court.*—Judgment affirmed.

---

[6] The parties stipulated at the hearing in the interest of brevity that a representative few objectors would testify from among a list of affected property owners.